This is an asylum withholding and convention against torture case. Ms. Markaryan claims to be a Jehovah's Witness who has been persecuted in Armenia because of her religious beliefs. The judge, in this case the immigration judge, states that she's a nice lady who is confused. In fact, she is a nice lady and she is confused. In fact, she has a medical document stating that she has memory loss. During the hearing, she was asked when the Armenian earthquake happened, and she testifies as being 1880 and not 1988 as the correct date. She's confused because she has a medical problem, but that does not make her not credible. She had few witnesses. In fact, she had two Jehovah's Witnesses who appeared for her at the hearing. One was an elder at the church. One, Daniel Parsepian, trains immigration officers to, when they do their interviews, how to detect if somebody is a true Jehovah's Witness or someone who is lying to their faith. And Mr. Parsepian testified saying that she's known as the Margarine who has appeared regularly at the Kingdom Hall, and she's very sincere in her belief in the Jehovah's Witness religion. Now, there were significant inconsistencies that the immigration judge noted between her application and her testimony. Is it your argument that she was credible, her testimony was credible, and then how do you explain the inconsistencies with the application? I'm not saying as far as her testimony was credible. She made a lot of mistakes. But we have to look at the entire picture. Her age is 71 years old. Well, now isn't she 75? Well, now, yeah. At the time of the hearing, she was 71. There's a medical document indicating that she has memory loss. And if somebody comes in front of the court and says that I became a Jehovah's Witness after the earthquake, and the earthquake happened 1880, we know there is a problem. If this person wanted to lie, he wouldn't make a date of 1880 when she wasn't even alive at that time. But the point is, if we look just at the testimony that she gave at her hearing, it doesn't seem to be enough there to really support her claims, even if she were credible. We say, well, she's a Jehovah's Witness and all of that. But she didn't seem to testify that she was mistreated or that it was because of her religious situation. Well, yes, as far as the testimony. But if we look at the application, the sign-up application. The application, however, was made out by somebody else, wasn't it? Based on what she told this person. And in evidence, there is the Armenian writing where she has written her story and given it to this person, who this person put it into the application. So you say the application is accurate, but she was confused in her testimony at the hearing. So we should disregard the testimony at the hearing and rely on what she said in her application? Yes, because of her medical condition, because there were credible witnesses who came to the hearing and testified in her behalf. There's affidavits from Armenia indicating that she was a Jehovah's Witness. So if this person, we don't know how her medical condition was at the time when she was preparing her asylum application. We know her medical condition at the time of the hearing. And we know that she had a problem at the time of the hearing. So if somebody who doesn't have a memory problem and prepares an asylum application, but years down the road when the hearing is conducted, she loses her memory, then are we going to state that this person is not credible because now she's lost her memory and she cannot credibly testify? Let me ask you something. The country reports corroborate her story, but the country reports are generalized. We can't use those alone to show that she was individually persecuted on account of her religion. What acts of persecution on account of her religion can we find in this record? On the record, there are also indications as far as the... So the asylum application, she talks about one of the weekly meetings. Are we talking about the State Department report, Your Honor, or... Well, I'm saying the State Department report, which is objective, corroborates the fact that Jehovah's Witnesses are persecuted in Armenia. But in order for your client to prevail, she needs to show individualized persecution. Well, there are a few incidents where she has in her asylum application, one where her husband is killed in I believe 1994, and there's a document evidencing that her husband died Then there are incidents where in December of 2000, she was detained for four days. It's on page 181 of the record. There's a few others that she was beaten on the same page, if you look at page 181. And then we get to her testimony. So these are all in the asylum application. We get to her testimony, and does she testify to those incidences again? I believe she did not. As I indicated, she was very confused. She couldn't recall dates. She couldn't recall almost nothing. This is a pretty real ID act case, so the dates don't really... We have plenty a lot on that. But what about the actual persecution? I think she indicated that she was detained and she was persecuted, but she couldn't specify exactly each occurrence. Well, there was one when she was in the bread line. Right. Now, was that by the government or by people the government was unable to control? Initially, it was the people, then I believe the government detained her. Okay, and she does say her husband was the only one the second time who was physically harmed, not herself. Yeah, but on the... I'm trying to help you. I'm sorry. No, no, I understand. I appreciate it. I'm saying we have a confused 75-year-old woman who has poor memory. I'm just trying to... You should be able to tell me what incidences of persecution are in the record that she did that are credible. The persecution of her, of her. I'm not discounting the asylum application. Right. But of her, was she able to testify to any persecution of her on account of being a Jehovah's Witness? I believe she also testified that in 1994 when she was at a sister's house, meaning religious sister, not her real sister, they were attacked at the religious gathering and they were attacked and violently beaten at that time. Does she have any family left in Armenia? No, she has nobody in Armenia. She just has a stepson in the United States. Do you want to reserve the rest of your time? Yes, Your Honor. Thank you. Good morning, Your Honors. My name is Jeffrey Bernstein and I represent the Attorney General of the United States. And first I'd like to talk about this memory loss issue which counsel raises. I guess there is a medical document in the record which indicates that Ms. Margeesian, Margearian, excuse me, came to a doctor about four days after she completed her asylum application or after another individual completed her asylum application. And he diagnosed her in a medical report I guess issued about a year later with short-term memory loss as opposed to long-term memory loss and a few other conditions. Again, it was short-term memory loss. And she first came to him about four to six days after this asylum application was prepared and it was a short-term memory loss. So clearly she should have been able to remember both at the hearing and when the application was being prepared these events which ostensibly allegedly occurred a number of years ago. Go ahead. I'm sorry. But when I read the transcript, much of it is incomprehensible. She's clearly not understanding the questions or the answers. And the I.J. remarks on that at several points about how she might have a problem, how she's clearly confused. He even says in his opinion that she's confused, that how he says if she has a memory loss, how do I know if anything ever happened to her? Well, that's correct, Your Honor. Yes. Shall I continue your case? So I'm having trouble. If she seems incomprehensible at the hearing, clearly even the I.J. indicates there's something going on. How can we say that there's an adverse credibility determination if her confused testimony is not consistent with her application? I'm having trouble seeing how that's supported by substantial evidence. Well, that's a number of questions, Your Honor. The immigration judge certainly indicated at one point that she may have – she may be confused. There's no question about that. He also did make an adverse credibility determination because, again, nothing she said, very little of what she said was consistent with the asylum application. They were almost diametrically opposed. So where does that leave the immigration judge? It's the Petitioner's burden of proving her case for asylum. So what's he left to believe? He can't believe the asylum application because it was written by somebody else. She alleges that she had a memory loss. How does he know that? Is there evidence in the record that – Yes. The asylum application contains the signature of the individual who prepared the application. But it also says that it's based on what she told him and it's also consistent with the country reports. It's – well, there is no testimony in the record which indicates that that application was prepared with her assistance. Absolutely none. Absolutely none. The Petitioner refers to some document in the record which contains her story, he says, but there is no – there was never a proffer that anything in the record consisted of her written – But it would have had to have been. Assertions. It's – I mean – Well, we can only speculate and I don't think we can – Well, wait a minute. It's got very, very specific information about her in this asylum application. It wasn't just made up out of whole cloth. And it may well have been made up of whole cloth. So that's the government's position? We don't know, Your Honor. We don't know. We only know – Well, I mean, it has things like her alien number, where she lives. I mean, some of that had to be given by her, don't you think? I'm sure that's that basic information. You know what, Counsel, I have never heard the government take this position before. I don't know what position you're talking about, Your Honor. That we just doubt that the asylum application – usually, typically, they are prepared by someone else because they have to be prepared in English. And the person who's seeking asylum doesn't speak English. Well, that may well be. Your Honor, I have no doubt that there is certain information in that asylum application which was given by Mrs. Marguer in the alien number, et cetera. Is it signed by her? It is signed by her. So she – It's in English. She signed the application and so attested to it. So I guess I'm wondering what's the basis for saying that it's not credible. The IJ seemed to base that determination solely on comparing the application with her testimony at the hearing. That's right. That's right. She came to the hearing to testify regarding her asylum application, and everything she said was almost diametrically opposed. There are certain things that she said that were consistent with her asylum application. She described the incident in 2000, although she was unable to give an event, a date. But she – But what's the law on that? I'm not being able to remember a date. What is the law in the Ninth Circuit on that? That insignificant dates don't matter, but significant dates do matter. And that is the Ninth Circuit's law on that. And this is a significant date. But I'm not going to even rely on that, Your Honor. She testified with respect to that. She said that, just as in her asylum application, that she was in a bread line talking with other Jehovah's Witnesses, and that the police came and took her into custody. And she testified to that at the hearing as well. But in her asylum application, it says that she was held for four days in a frozen cell without food for four days. In her testimony, she mentions nothing about being held for four days. She said she was let go that day because the Armenian officials felt sorry for her. She says she was asked if she was ever physically hurt in Armenia. She says no. She was asked if she was ever arrested in Armenia. She says no. She so ---- There's no doubt that there's inconsistencies between her testimony and the application. I don't think there's any doubt about that. The troubling question to me is that the her testimony at the hearing didn't seem to be comprehensible. She was not responding appropriately to questions. When asked about her religion or just basic Christianity, what's the Sermon on the Mount, she's unable to respond. And it's hard to see how that relates to credibility as opposed to some mental problem. I don't think, Your Honor, if I may, I don't think the hearing testimony reveals that she, you know, had absolutely no idea what was going on. She did respond to questions. She was asked what her problems were, and she said, well, my husband died, and I was lonely after that, and I was unable to make a living because the government stopped the pension when her husband died. And that's perfectly responsive. So there is absolutely no evidence that she simply couldn't give a comprehensible account. But the immigration judge, as I said before, was left in a quandary. What to believe? She said she had memory loss. She said she had memory loss, short-term memory loss. She said she had memory loss, but she was able to provide information to, well, that the asylum application was prepared. Her testimony, and again, there's no indication that she is incompetent. There's some indication. Assuming that somebody comes into the hearing and appears to be incompetent, and I don't know that we've had a case here in the Ninth Circuit, but there are other cases, what is the IJ's responsibility in those situations? Well, I think that if an individual is clearly incompetent, and I think you may have law on this. I can't really remember, but I think you may. I think if they're clearly incompetent, then perhaps the immigration judge should hold the hearing and inquire of counsel, et cetera, as to what to do. But I don't think the immigration judge, it's clear that the immigration judge didn't find her entirely incompetent. And I think the record of hearing establishes that she's not incompetent because she was able to understand and answer questions. Now, some of her answers were, I don't know, but there's no indication that she wasn't misunderstanding the question. The IJ even says at one point, I don't think she's understanding what you're asking her. I'm not sure she even knows what these words mean. Well, with respect to one question, that's true, Your Honor, but you have to look at it all. You really can't focus in on one question. An overall view of the hearing transcript does not reveal someone who is incompetent. It reveals somebody who cannot provide information consistent with that information which may or may not have been provided to her by her in the asylum application. Now, the immigration judge was not, you know, mean to this individual. The immigration judge indicated that he did feel sorry for her situation, but there was nothing that he could do for her because he could find no evidence, no credible evidence, that she was entitled to asylum. If a person so, okay, so we're just talking about an adverse credibility decision right now and whether or not that was supported by substantial evidence. But just in general, if a person who's a refugee comes to this country claiming persecution, fills out an asylum, you know, goes through the credible fear, fills out an asylum application, two years later has a hearing and is mentally incompetent and testifies inconsistently or seems confused, is it the government's position that that person cannot satisfy their burden of proof of being a refugee? Well, it's not the government's position. I mean, I don't think this case calls for us to take a position with respect to that. Well, I'm asking the question so you could answer it. Well, I'm happy to answer it, Your Honor. Please answer the question. Answer the question. Well, I mean, I'd like to explain my answer. Well, explain it. Go ahead. Clearly, if somebody at a hearing, which is, and this isn't in this case, is clearly established to be entirely incompetent, then if there is some other way that the individual can establish the facts of their case, then they would be entitled to asylum.  And if there's absolutely no credible evidence to support a determination that an individual is entitled to asylum, even if the individual is incompetent to testify, then asylum can't be granted. Now, the immigration judge did indicate that there were other ways that this woman could proceed. And he advised her that she could receive a deferred adjudication or a deferred removal order. In other words, that removal could be deferred. I guess he did not specifically suggest, but the tone of his remarks should have alerted the attorney that perhaps the attorney should have applied to the INS at that time, the DHS now, for such action. But no application for such... That's still an open avenue of relief for her? It always is. In fact, I actually discussed this with DHS counsel the other day. And they said that we certainly consider these things, and, you know, if an application is filed, we would consider it. Especially in this case where she's 75 and was clearly confused four years ago. Well, Your Honor, I don't know that I can agree that she was thoroughly confused. I said clearly confused. I'm going off what the I.J. said, not what, you know, your argument, your legal position today. He said she was clearly confused about one particular question, as I recall. There's no question that his general remarks evidenced the concern. But there is, again, no question in my mind, based upon my reading of the transcript and the immigration judge's decision, that she was clearly not incompetent. To be quite honest with you, Your Honor, I think, as the immigration judge thought, that she was probably telling the truth at the hearing. You know, she clearly had undergone Jehovah's Witness training in the United States. And she was continuing to undergo. There's a question whether or not she was, you know, an active Jehovah's Witness in Armenia. There are a couple affidavits, but they are bare and they're unexplained. And there are affidavits which this court, of the type that this court has held, are really not relevant to a factual determination. Well, thank you, counsel. You're over your time. We appreciate it. It's a good argument, and we appreciate it. And I think you have 40 seconds left or so. Thank you. Thank you, Your Honor. As far as counsel indicated that there's no evidence that she prepared the asylum application, on page 164 of the record, there's a handwritten declaration, which I note personally that this judge always requires from every applicant, showing that they prepared the story of the asylum application, so that when they come to court, they will not change and say, well, I didn't tell this to the preparer, and he prepared himself. So, in fact, we have a handwritten declaration. Well, I've never seen a case where the government took the position, and I think that's probably why. I think that's pretty standard procedure, that they sign it right before the hearing starts. They do, and also this judge requires the native language declaration in their own handwriting saying what the story was that you gave it to this preparer to prepare. Now, if I may respond to other avenues that counsel has brought up, on other cases, we've had elderly people, and I personally have had a few clients like that, I've tried deferred action, all the other things, and it's impossible to get anything through DHS. They'll submit an application, and they never respond. In fact, on one case, a judge, I asked the judge to even write a letter, and he wrote a letter, and we were unable to get anything out of DHS. All right, counsel. Thank you very much. The case of Margarian v. McKayce is submitted. We will take up Canturian v. McKayce. And I believe we have the same counsel.
judges: Thompson, Wardlaw, Ikuta